UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BEVERLY RUSSELL

CIVIL ACTION

VERSUS

NO. 19-760-JWD-EWD

PARKVIEW BAPTIST SCHOOL, INC.

<u>RULING AND ORDER</u>

This matter comes before the Court on *Defendant's Motion for Summary Judgment* (Doc. 9) filed by Parkview Baptist School, Inc. ("Defendant" or "PBS").  Plaintiff Beverly Russell ("Plaintiff" or "Russell) opposes the motion. (Doc. 11.)  Defendant has filed a reply. (Doc. 14.) Plaintiff filed a surreply. (Doc. 17.) Oral argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.  For the following reasons, Defendant's motion is granted.

I.      **Introduction**

Russell was first hired by PBS in August 2012 as an assistant volleyball coach. (*McCaughey Aff.* ¶ 6, Doc. 9-4; *see also Russell Decl*., Doc. 11-2 at 1; *Russell Dep.* 58, Doc. 11-11 at 6.)[1]  In August 2013, Plaintiff was hired in a full-time position as a PE teacher and assistant volleyball coach. (*McCaughey Aff.* ¶ 6, Doc. 9-4; *see also Russell Decl*., Doc. 11-2 at 1–2; *Russell Dep.* 58–60, Doc. 11-11 at 8.)

On April 9, 2019, Russell tendered her resignation to PBS. (*Def.'s Statement of Uncontested Material Facts in Support of MSJ ("DSUMF")* ¶ 1, Doc. 9-2; *Pl.'s Response to*

---

[1] Both parties object to the affidavits and declarations submitted by the other for failure to comply with Federal Rule of Civil Procedure 56(c).  As will be discussed below, the Court will not strike any of these documents *in toto*.

*[DSUMF]* ("*PRSUMF*") ¶ 1, Doc. 11-1)[2]   Plaintiff claims that she did so "under circumstances constituting a constructive discharge, *i.e.*, a reasonable person in her position would have felt compelled to resign due to the imposition by PBS of objectively intolerable working conditions, and Ms. Russell felt so compelled." (*PRSUMF* ¶ 1, Doc. 11-1.)  Russell's complaints largely center on her treatment at the hands of Christina Anderson, an African-American woman who was named Principal of PBS in August of 2017. (*See Russell Decl.*, Doc. 11-2; *McCaughey Aff.* ¶ 7, Doc. 9-4.)  The details of Plaintiff's complaints about Anderson will be discussed below.

Plaintiff is a white woman over the age of 60. (*Russell Decl.*, Doc. 11-2 at 1.)  She brings claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); discrimination and retaliation under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 (the "ADEA"); and interference and retaliation under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* (the "FMLA"). (*Compl.*, Doc. 1.)

In the instant motion, Defendant seeks dismissal of all claims.  With respect to the Title VII and ADEA discrimination claims, the Court agrees with Plaintiff that Defendant focuses almost exclusively on the question of whether Plaintiff proved a *prima facie* case and that Defendant argues the other issues in only a vague or perfunctory way.  Consequently, Defendant has waived those issues.  With respect to the other claims—the retaliation claims under Title VII and the ADEA, and those under the FMLA—the Court agrees with Defendant that Plaintiff has failed to properly oppose the motion and that these claims must be dismissed.  Thus, the central issue before the Court is whether Plaintiff brought forward sufficient evidence to make a *prima facie* showing of discrimination.

---

[2] As a general matter, when both the *DSUMF* and *PRSUMF* is cited in support of a fact, the parties agree to that fact.

2

Having carefully considered the matter, the Court finds that Plaintiff has not done so. Though a *prima facie* burden is minimal, Plaintiff still had to meet the high standard of proving a constructive discharge, which requires something more than a hostile work environment claim. She has not. Even accepting her admissible evidence as true and construing reasonable inferences in her favor, no reasonable jury would conclude that Plaintiff was constructively discharged from PBS. Consequently, Defendant's motion will be granted, and all of Plaintiff's claims will be dismissed.

## II.    Relevant Factual Background

### A.  Preliminary Evidentiary Issues

As noted above, both parties attack all affidavits or declarations submitted by the other on a variety of grounds. First, Plaintiff urges that Defendant's affidavits should be struck in full because each one says, "All statements made in this Affidavit are based on my personal knowledge and are true and accurate to the best of my information and belief." (Doc. 11 at 1 (citing Doc. 9-4, 9-8, 9-9, 9-11, 9-12, and 9-13).) Plaintiff asserts that the "on my information and belief" language fails the personal knowledge requirement of Federal Rule of Civil Procedure 56(c). (*Id.*) Plaintiff then contends that, "[b]esides the wholesale shortcomings discussed above, the majority of the individual affidavits are objectional on the basis of being too vague and conclusory and because some contain hearsay and double hearsay information, opinion, characterizations, and outright speculation." (Doc. 11 at 3.) On the whole, Plaintiff spends over seven pages highlighting alleged deficiencies in Defendant's affidavits.

Defendant replies by going affidavit by affidavit to explain why the objected-to information is in fact admissible. (Doc. 14 at 2–4.) Defendant then devotes four pages to making objections to Plaintiff's declaration, arguing that it contains inadmissible hearsay and multiple

statements that are subjective opinions or legal conclusions; that are not based on personal knowledge; that contradict deposition testimony; and that contradict Plaintiff's own opposition or the evidence. (Doc. 14 at 4–8.)

Though the Court has reviewed all of the evidence, the Court will not detail a ruling on every evidentiary objection the parties made, as doing so would not be a wise use of judicial resources. Rather, the Court will provide an overview of the principles it employed in deciding what evidence to consider and then rule on Plaintiff's general objection to all of Defendant's affidavits. The Court will then address specific objections where relevant in the facts and analysis section below, providing the explanation appropriate under the circumstances.

As to general principles, under Rule 56, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Thus, one requirement of Rule 56(c) is "that the information they contain (as opposed to the affidavits themselves) would be admissible at trial." 10B Mary Kay Kane, *Federal Practice & Procedure (Wright & Miller)* § 2738 (4th ed. 2020). "Because the policy of Rule 56(c)(4) is that the judge should consider any material that would be admissible at trial, the rules of evidence and their exceptions determine what allegations the affidavit may contain." *Id.* "Questions regarding admissibility at trial are [generally] determined in the federal courts by the Federal Rules of Evidence[.]" *Id.*

"[I]t is [also] true that Rule 56 requires that summary judgment affidavits be based on personal knowledge[.]" *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529 (5th Cir. 2005) (citing Fed. R. Civ. P. 56(e)). For example, "ultimate or conclusory facts and conclusions of law, as well as statements made on belief or 'on information and belief,' cannot be utilized on a summary-

judgment motion." *Wright & Miller*, *supra*, § 2738; *see also Richardson v. Oldham*, 12 F.3d 1373, 1378–79 (5th Cir. 1994) (finding no abuse of discretion in district court striking portions of affidavit that were based on information and belief because they were "not based on personal knowledge and therefore fail[ed] the requirements of Fed. R. Civ. P. 56(e)"); *Bolen v. Dengel*, 340 F.3d 300, 313 (5th Cir. 2003) (striking affidavit as inappropriate summary judgment evidence because the affidavit "specifically noted that 'on information and belief, and to the best of affiant's recollection' " and thus was "not based on personal knowledge").

"Nonetheless, while an affidavit certainly *can* explicitly state that it is based on 'personal knowledge,' " *DIRECTV*, 420 F.3d at 529–30,  and while "an affidavit cannot affirmatively state that it is *only* based on 'information and belief,' " *id.* at 530 n. 40 (emphasis added) (citing *Bolen*, 340 F.3d at 313), there is no requirement for a set of magic words," *id*. at 530.  "As to competency, for example, [the Fifth Circuit has] held that in the summary judgment context, even when a party's response is a verified pleading that 'does not affirmatively state in the document itself that the [persons] are competent to testify as to the facts to which they swore,' it 'does not necessarily doom their testimony.' " *Id.* at 530 (quoting *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1987)).  The Fifth Circuit has also quoted with approval a Ninth Circuit opinion which "found it proper in the summary judgment context for district courts to rely on affidavits where the affiants' 'personal knowledge and competence to testify are reasonably inferred from their positions and the nature of their participation in the matters to which they swore.' " *Id.* (quoting *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)). Thus, in *DIRECTV*, the Fifth Circuit declined to strike an affidavit for lack of personal knowledge because it was within the affiant's position—or his "sphere of responsibility"—to be familiar with the investigation discussed in the affidavit, so his knowledge could be "reasonably inferred." *Id*.

5

(quoting *Hodges v. Exxon Corp.*, 563 F. Supp. 667, 669–70 (M.D. La. 1983)).

The Sixth Circuit also took such a moderate approach with respect to affidavits based in part on knowledge and in part on belief in *Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015). There, the district court granted defendants' motion to strike plaintiffs' affidavits. *Id.* at 604. Plaintiffs had sworn that their statements were based on "personal knowledge and belief." *Id.* In affirming the lower court, the Sixth Circuit explained:

> We hold that when affidavits based on knowledge and belief are submitted to support or oppose a motion for summary judgment, the district court has discretion to determine whether it can differentiate between knowledge and belief for each averment in the affidavit. If the court can distinguish between the two, then . . . the court should excuse the affiant's stylistic error, and must admit the parts based solely upon personal knowledge, while striking the parts based upon belief. If the court cannot differentiate between the two, then consistent with the rationale in *Wright & Miller*, the court must strike the affidavit in its entirety[.]

*Id*. at 605; *see also Wright & Miller*, *supra*, § 2738 ("Where the affidavit includes both competent and incompetent evidence, the Court should disregard the incompetent evidence but give full consideration to that which is competent. . . . This is nothing more than the procedure which would be followed at trial. The Court would not strike the entire testimony of a witness merely because a portion of his testimony is incompetent. The same rule is to be applied to supporting affidavits." (quoting *Dickheiser v. Penn. R.R. Co.*, 5 F.R.D. 5 (E.D. Pa. 1945), *aff'd* 155 F.2d 266 (3d Cir. 1946)).

This Court will take the same approach detailed in *Ondo*, *DIRECTV*, and *Wright & Miller*. The Court declines to strike each of Defendant's affidavits solely because they state they are made based on personal knowledge *and* are true and accurate to the best of the affiant's information and belief. Doing so would be tantamount to requiring the "magic words" which the Fifth Circuit rejected in *DIRECTV*. Rather, the Court will attempt to determine from context, including the

6

witnesses' "sphere of responsibility," whether the witness is competent to testify about the matters asserted.

For example, Gina McCaughey attested that she is the Director of Human Resources at BPS and has been employed there for thirteen years. (*McCaughey Aff.* ¶ 3, Doc. 9-4.) McCaughey further stated that, as Director of Human Resources, she is familiar with Russell (who was an employee of PBS) and had access to custodian records. (*Id.* ¶ 4–5.) As reflected above, she testified about when Plaintiff was hired and in what positions. (*Id.* ¶ 6.) Surely all of this information is within her "sphere of responsibility," and the Court can reasonably infer that she is competent to testify as to these matters from her position.

Ultimately, this is a minor issue; since the motion turns on whether Plaintiff met her *prima facie* burden on the constructive discharge claim, the relevant evidence that is material to the Court's decision comes from Plaintiff's own declaration and deposition and the evidence she submitted.

## B. Facts Related to Constructive Discharge Claim

### 1. Summary

Plaintiff testified that, at the time she resigned on April 9, 2019, she had not been demoted, had not received any type of salary reduction, had not had her job responsibilities reduced, had not been assigned menial or degrading work, and had not been assigned to work under a younger supervisor. (*Russell Dep.* 78–79, Doc. 9-5 at 9–10.)

Rather, Russell said she believed she was badgered, harassed, or humiliated by Anderson in such a way as to encourage her resignation. (*Id.* 79, Doc. 9-5 at 10.) In sum, Plaintiff claims that Anderson did so in the following ways: (1) Plaintiff received more evaluations than other teachers and received anonymous student evaluations; (2) male students were assigned to her class;

(3) Plaintiff was accused of bullying a student; (4) Anderson escalated a situation involving sensitive teaching materials which students posted on social media; (5) Plaintiff was constantly emailed about her lesson plans being in the incorrect format; and (6) she was shorted $677.03 in one of her pay checks. (*See id.*, Doc. 9-5 at 4–24.)  The Court will examine each of these claims in turn.

### *2. Evaluations*

Plaintiff first complains about the number of evaluations that she received at PBS and the fact that she received anonymous student evaluations.  Specifically, Plaintiff declares that she received six evaluations in the 2017–18 year, including "two formal observations, on consecutive days, September 25th and 26th, 2017, an informal observation in November 2017, a formal observation dated March 14, 2018 (with lower scores than the previous evaluations), an end of year evaluation dated April 20, 2018, plus in late May 2018 Anderson gave me anonymous student evaluations." (*Russell Decl.*, Doc. 11-2 at 2.)  Plaintiff claims all of this was not in accordance with the policy in the handbook, as (1) teachers with her experience only need to be evaluated once every other year, and (2) the handbook does not include anything about anonymous student evaluations. (*Id.*; *see also Anderson Dep*. 36–37, Doc. 11-6 at 8–9 (admitting that anonymous evaluations were not in the handbook but noting it was "continued from the previous administration.").)

Similarly, Plaintiff testifies at her deposition that Becky Madden, the head volleyball coach, saw what Anderson did to Plaintiff that was discriminatory. (*Russell Dep.* 118, Doc. 11-11 at 10; *Madden Dep*. 5, Doc. 11-10 at 5.)  What Madden saw included the  "formal evaluations, how many student evaluations [she] got[.]" (*Russell Dep.* 118, Doc. 11-11 at 10.)

The evaluations themselves are also in evidence, and they warrant discussion.  In her formal observation on September 25, 2017, by A. McCallister,  Plaintiff was given rating with almost all 4 out of 4s ("Highly Effective"), with only one 3 out of 4 ("Effective: Proficient"). (*Evaluations*, Doc. 11-7 at 9–15.)  For her September 26, 2017, formal evaluation by Anderson, Plaintiff was given a rating of 3 out of 4 ("Effective: Proficient") in almost all categories except one involving adapting instructional opportunities to diverse learners, in which she received a 2 out of 4 ("Effective: Emerging"). (*Evaluations*, Doc. 11-8 at 1–6.)  Her November 2017 evaluation had seven "Highly Effectives" and three "Effective: Proficients" (*id.* at 7–10), and her March 2018 evaluation by Anderson had two "Highly Effectives," six "Effective: Proficients," and two "Effective: Emergings" (*id.* at 11–13).

Perhaps most importantly, her 2017–2018 end of the year evaluation gave her an overall performance of 3 out of 4 ("Effective: Proficient"). (*Evaluations*, Doc. 11-8 at 17.)  This evaluation provides at the end a box checked that "Teacher has a satisfactory evaluation" rather than the one which said, "Needs Improvement: Teacher will be placed on improvement plan for the 2018-2019 School Year." (*Id.*)

Similarly, Plaintiff's April 1, 2019 evaluation includes six "Highly Effectives" and six "Effective: Proficient." (*Evaluations*, Doc. 11-9 at 1–6.)  This evaluation came a little over a week before her resignation. (*See Russell's Resignation Letter*, Doc. 11-9 at 9; *see also Russell Dep.* 187, Doc. 9-5 at 24.)

Finally, Plaintiff admitted that, as a result of the evaluations she received, her pay was never docked, she was never refused a raise, and she never received a pay cut that she was aware of. (*Russell Dep.* 187, Doc. 9-5 at 24.)  She did say she was threatened with not being hired, and she based that off Anderson's April 9, 2019 letter calling Plaintiff insubordinate and

recommending that Plaintiff not be renewed, with grounds for termination. (*Id.*; *see also Anderson Letter*, Doc. 11-9 at 11–12.)  Plaintiff said, "This is eight days after she gives me the best observation, formal, with the best scores in two years." (*Russell Dep.* 187, Doc. 9-5 at 24.)  But Plaintiff also testified at her deposition that, at the time she resigned, a new contract was imminent in being offered to her for the following year and that, had she not resigned, she would have been offered a new contract for the following year. (*Russell Dep.* 76, Doc. 14-1 at 4.)

### *3. Male Students*

Plaintiff also stated that she was assigned two male students in her first period all-girls PE class and that she complained that she was unable to supervise them in the locker room. (*Russell Decl.*, Doc. 11-2 at 2.)  Plaintiff referenced conversations with Jermaine Williams and Reggie Watts, who are other PBS employees who were supposed to watch the male students but allegedly did not, but such conversations are hearsay.[3] (*See id.* at 2–3.)  However, Plaintiff attested that she complained to Anderson about this assignment. (*Id.* at 3.)  Later, PBS assigned her 17 senior male football players in her First Period girls' PE class, and Plaintiff said she had to complain repeatedly to correct the situation. (*Id.*)

Plaintiff similarly testified in her deposition about receiving emails from Anderson "on the class rolls" and about Anderson not "telling the truth to [Plaintiff]" about Watts and Williams supervising the male students assigned to her. (*Russell Dep.* 118–19, Doc. 11-11 at 10–11.)  Plaintiff asked how she could be with 11 girls in the girls' locker room and also supervise the boys in their locker room. (*Id.* 119, Doc. 11-11 at 11.)  According to Plaintiff, Watts did not arrive "until he wants" and Coach Williams was essentially busy coaching and could not supervise her students. (*Id.* 120, Doc. 11-11 at 12.)

---

[3] As will be clear below, Williams and Watts are also Plaintiff's alleged comparators.

Plaintiff testified, "In my opinion, I'm being set up. I've got boys in my first hour. I've got 11 girls. That's never been done before." (*Id.*) Plaintiff then stated that Anderson emailed her back to say that "we do that in Granger's boot camp," but Plaintiff then said "that's where the job description got skewed. And besides, I can't go in the male locker room." (*Id.*)

When asked if anything negative happened to her as a result of the assignment of boys to her class, she said, "Well, A, the rolls. And Judy Turner, rest her soul – she's passed. She could have testified. The rolls were completely wrong, the class rolls. And this is where I knew something was going on." (*Id.*) Plaintiff later said she was being "set up" for something "illegal," such as a boy accusing her of "eyeing" him. (*Russell Dep.* 122, Doc. 9-5 at 13.) But, she also testified that (1) nothing like that happened because she did not go in the boys' locker room, and (2) she was never punished or disciplined for not handling the situation correctly. (*Id.*)

### 4. Bullying the Student

Plaintiff next attested that Anderson summoned Plaintiff to her office and accused her of bullying a student. (*Russell Decl.*, Doc. 11-2 at 3.) Plaintiff said that the student spoke well of Plaintiff and wrote a letter on her behalf, but statements to this effect in Plaintiff's declaration are hearsay.

### 5. The Sensitive Material Incident

In her declaration, Plaintiff asserts:

> In January 2019, two volleyball students found some sensitive materials on my desk (pamphlets for health class, which I had determined would not be used), and posted them on social media. I became aware of this incident quicky and shared it with Madden, the high school Dean of Students in accordance with the PBS chart of responsibilities that Anderson gave out at a faculty meeting. Madden and I promptly investigated and found out which students were responsible, talked with the students about it, and the students removed the materials and apologized to me in person and on social

media.  Anderson unnecessarily escalated this situation and harassed
me about it.

(*Russell Decl.*, Doc. 11-2 at 3–4.)

Russell's deposition adds little to the account given in her declaration on this issue. (*See
Russell Dep.* 127, 131, Doc. 11-11 at 13–14.)  She acknowledged that the pamphlets were not
approved lesson plans. (*Russell Dep.* 130, Doc. 9-5 at 16.)    But Plaintiff also provides few
additional details as to how Anderson "escalated it":

> I feel that she let it escalate. Why, Murphy? Why didn't she come
> talk to me Monday morning in person? And she waits till Friday.
> And I had asked for a third party to sit in. . . . But, anyway, she let's
> [sic] it escalate and – you know. . . . I guess my credibility, my
> integrity, my self – who I'm about – and I ask her, "Why didn't you
> come talk to me in person?" on several occasions.  That's why I have
> so many email responses from her.

(*Russell Dep.* 133–34, Doc. 9-5 at 18–19.)  Finally, Plaintiff admits that she was not disciplined
over this incident. (*Id.*)

### 6. Incorrect Lesson Plans

In her declaration, Plaintiff stated that she was "disciplined because [she] allegedly
submitted incorrect lesson plans." (*Russell Decl.*, Doc. 11-2 at 4.)    Plaintiff said that she
"constantly received emails from [Becky Polk (PBS's Curriculum and Instruction Coordinator)]
stating, 'Your lesson plans are not in, boys four PE,' and [Russell] kept sending back, 'I have no
students in that class.'" (*Id.*; *Polks Aff.* ¶ 3, Doc. 9-13.) )  Plaintiff also declared that, "As chairman
of high school PE, I have access to all PE teachers' lesson plans; Jermaine Williams' lesson plans
were incomplete and in incorrect format for the entire year." (*Russell Decl.*, Doc. 11-2 at 4; *see
also Russell Dep.* 151, Doc. 11-11 at 17.)

Plaintiff said that Williams and Watts were "not harassed about lesson plans and class
rolls," (*Russell Decl.*, Doc. 11-2 at 1), but Plaintiff fails to provide a foundation for knowing that

12

Williams and Watts did not receive such "harassment." Indeed, in her deposition, Plaintiff admits that she did not know whether Williams or any other faculty members received emails from Anderson telling them that their lesson plans were incorrect. (*Russell Dep.* 168, Doc. 11-11 at 21.)

Plaintiff was also asked how she was disciplined in her deposition, and she replied:

> The rolls were incorrect from August – I'm still getting "Your lesson plans are not in, boys four PE." I keep sending back, "I have no students in that class." I've given Becky Polk all the – I rectified the situation because I kept getting Saturday-night forms from [Anderson]. . . . To me, that's discipline against my character and my integrity.

(*Russell Dep.* 168–69, Doc. 11-11 at 21–22.) However, Plaintiff admitted that she was never suspended, received a pay cut, or threatened with termination for the lesson plans. (*Id.* 169, Doc. 11-11 at 22.)

### 7. The Paycheck Shorting

Plaintiff testified, "[i]n mid-February 2019, PBS shorted [her] paycheck by $677.03." (*Russell Decl.*, Doc. 11-2 at 4.) Plaintiff said the "mistake" happened because of a "payroll discrepancy dating back to the previous school year, and was apparently caused by Anderson shuffling the time-keeping responsibilities." (*Id.*) According to Plaintiff, Superintendent Mayes sent an email on February 22, 2019 saying he would "speak with Anderson regarding the issues involving time management, making sure Jamie Bozeman is consistent and accurate with accounting, who will then inform Stacy Palumbo." (*Id.*) Palumbo was the sub coordinator who gets the notification if an employee is going to be out so she can arrange a sub. (*Anderson Dep*. 70, Doc. 11-6 at 14.) Anderson testified that she followed up with Bozeman "just to make sure she was getting things in the book and then they always pull these statements and compare those when they have to submit time." (*Id.*) Plaintiff counted the shorted paycheck as another instance of harassment. (*Russell Decl.*, Doc. 11-2 at 4.)

But, Plaintiff testified at her deposition that she complained of the discrepancy on February 21, 2019, and the discrepancy was resolved on February 22, 2019, the next day, though "after 17 hours of [her] figuring it out." (*Russell Dep.* 157, Doc. 9-5 at 22.)  Parkview agreed with Plaintiff and reimbursed the $677. (*Id.*)

### 8. Other Purported Evidence

In part summarizing the above allegations, Plaintiff declared:

> [PBS] treated my comparators, Williams and Watts, younger black male employees, more favorably than it treated me.  Williams and Watts were observed/evaluated less frequently, not required to sign in or out when away from campus, allowed to teach board games and water pong in PE, allowed to let their students use cell phones and dress out inappropriately in class, not required to have teaching certificates or to obtain professional development credits, not harassed about lesson plans and class rolls, not harassed by having inappropriate gender students assigned to their classes repeatedly, not confronted with anonymous student evaluations, not given paychecks that were for less than the correct amount, were told of upcoming evaluations in advance, were not harassed about accusations of bullying students, and Anderson did not recommend termination or non-renewal of their contracts, as she did me.

(*Russell Decl.*, Doc. 11-2 at 1.)

Additionally, Madden testified that she told the Superintendent  "basically that [Plaintiff] felt that she was being targeted and, . . . harassed and she didn't understand why those things were going on." (*Madden Dep*. 14–15 Doc. 11-10 at 7–8.) Madden also said that she worked very closely with Plaintiff for the past seven years, and she could just tell that Plaintiff was losing her patience and she couldn't continue in that environment. (*Id.* 20–21, Doc. 11-10 at 10–11.)

Plaintiff also points to Gina McCaughey's testimony.  McCaughey stated that, during the 2017–18 school year, nine faculty left. (*McCaughey Dep*. 27–28, Doc. 11-13 at 6–7.) During the 2018–19 school year, fourteen left. (*Id.*)  But no details are provided as to the circumstances of

these departures, except that two teacher positions were removed because of budget cuts. (*Id.* 28, Doc. 11-13 at 7.)

### C.  Plaintiff's Resignation

In January and February 2019, Superintendent Don Mayes (Anderson's supervisor) and Plaintiff exchanged emails about Anderson's alleged harassment and Plaintiff's desire to work under a different supervisor. (*Russell Decl.*, Doc. 11-2 at 4; *see also Anderson Dep.* 7, Doc. 11-6 at 5; *Russell Dep.* 135, Doc. 11-11 at 15.)  Russell declared that "[a]ttempts were made to have a meeting among Mayes, Anderson, and [Plaintiff], . . . no such meeting ever occurred," (*Russell Decl.*, Doc. 11-2 at 4), but Plaintiff also acknowledged saying in an email, "Let Don know that I'll send him a text . . . after practice to tell him that I do not see any positives to come out of this meeting.  I do not line up with Christina's leadership style, as I've told him in person, after two 'Credibility and Integrity Accusations,' " (*Russell Dep.* 138, Doc. 11-11 at 16.)

Mayes testified that Anderson, Plaintiff, and he never met. (*Mayes Dep.* 26, Doc. 11-12 at 15.)  Mayes also stated that, from February through April in 2019, he was away from campus for mission trips, speaking engagements, or working remotely. (*Id.* 36, Doc. 11-12 at 17.)

On April 9, 2019, Plaintiff sent to Anderson her letter of resignation, effective at the end of the day on April 10, 2019. (*Russell's Resignation Letter*, Doc. 11-9 at 9.)  Plaintiff stated that she had hoped that she could be re-assigned to a different division with a new supervisor, but she learned from McCaughey during the previous week that this was not an option.  (*Id.*)  Plaintiff said that she agreed to Maye and McCaughey's offer to be paid in full for the remaining of her 2018-2019 employment contract, that she be allowed to do her PBS summer camps, and that she have the opportunity to remain Madden's CECP volleyball coach for the 2019-2020 season. (*Id.*)

Plaintiff testified by declaration:

> On April 9, 2019, Anderson penned a letter to McCaughey, with a copy to Mayes, claiming that I was "insubordinate" and not a Christian role model in my speech, actions, and attitude. Anderson claimed that my responses, actions, and comments had led her to believe that part of the issue could be with Anderson being African-American, and she felt that my behavior was discriminatory against her, and that I was creating a hostile work environment in the highschool [sic]. Anderson stated that my behaviors and actions would support non-renewal of my contract and would be grounds for termination.

(*Russell Decl.*, Doc. 11-2 at 5.) Anderson's letter is in evidence. (*Anderson Letter*, Doc. 11-9 at 11–12.) Mayes recalled seeing the letter; he did not believe he had a discussion with Anderson about it, but he said he could not be sure. (*Mayes Dep.* 44, Doc. 11-12 at 20.)

Plaintiff was paid through the end of July. (*DSUMF* ¶ 1, Doc. 9-2; *PRSUMF* ¶ 1, Doc. 11-1.) This was the full amount for the remainder of her 2018-2019 employment contract. (*DSUMF* ¶ 1; *PRSUMF* ¶ 1.)

Mayes said that, as of May 26, 2020 (the date of his deposition), Plaintiff was "not banned from [PBS's] campus, [they] intended to have her on [its] campus." (*Mayes Dep.* 40, Doc. 11-12 at 19.) However, defense counsel said by email on November 7, 2019, that she was not allowed on Parkview grounds or campus until further notice. (Doc. 11-4; Doc. 11-5.)

### III.    Summary Judgement Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .   [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (emphasis omitted) (internal citations omitted) (quoting Fed. R. Civ. P. 56(a)). The

non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## IV.    Discussion

### A.  Title VII and ADEA Discrimination Claims

#### *1. Title VII and ADEA Discrimination Claims Generally*

"The ADEA prohibits age-based employment discrimination against persons, like [Plaintiff], who are at least forty years old." *Wright v. United Parcel Serv., Inc. (Ohio)*, No. 20-30249, 2021 WL 235632, at *1 (5th Cir. Jan. 22, 2021) (citing 29 U.S.C. §§ 623, 631). "Title VII prohibits employment discrimination based on a person's 'race, color, religion, sex, or national origin.' " *Id.* (quoting 42 U.S.C. § 2000e-2(a)(1)). "Under both statutes, plaintiffs may prove their case either through direct or circumstantial evidence." *Id.* (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–100 (2003) (Title VII); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (ADEA); *see also Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 377 (5th Cir. 2010) ("In employment discrimination cases, a plaintiff may rely on direct or circumstantial evidence, or both.").

17

"When a plaintiff relies on circumstantial evidence, [the Court] assess[es] her claim under the *McDonnell Douglas* burden-shifting framework." *Wright*, 2021 WL 235632, at *1 (citing *Roberson-King v. La. Workforce Comm'n, Off. of Workforce Dev.*, 904 F.3d 377, 380 (5th Cir. 2018) (Title VII); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005) (ADEA)). "Under that framework, the plaintiff must first make out a *prima facie* case of discrimination." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "If she does, the employer must then proffer a legitimate, non-discriminatory reason for the adverse employment action." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). "If one is presented, the burden shifts back to the employee, who may then rebut the proffered reason by showing it was pretextual." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

The final stage of the *McDonnell Douglas* framework differs for Title VII and the ADEA. Under Title VII, Plaintiff "must . . . 'offer sufficient evidence to create a genuine issue of material fact either (1) that [Defendant's] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [Defendant's] reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is [Plaintiff's] protected characteristic (mixed-motives alternative).' " *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)). Conversely, "[t]o prevail for discriminatory discharge under the ADEA, plaintiff must prove 'that age was the "but-for" cause of the challenged employer decision[.]' " *Williams v. Waste Mgmt., Inc.*, 818 F. App'x 315, 318–19 (5th Cir. 2020) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). "Although the *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated, the issue at the pretext stage is whether [the employer's] reason, even if incorrect,

was the real reason for [plaintiff's] termination." *Id.* at 319 (cleaned up, citations omitted). "Restated, once the employer satisfies its burden, the presumption of discrimination 'simply drops out of the picture,' and plaintiff must 'pro[ve] that the defendant intentionally discriminated against [her] because of [her]' age." *Id.* (cleaned up) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

Again, the Court finds that the motion turns on the *prima facie* requirement, which is the same for present purposes under Title VII and the ADEA. *See Wright*, 2021 WL 235632, at *1–2. "A plaintiff makes a *prima facie* case of discrimination by showing she '(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside her protected group or was treated less favorably than other similarly situated employees outside the protected group." *Id.* at *1 (quoting *Morris v. Town of Independence*, 827 F.3d 396, 400 (5th Cir. 2016)). "To establish a prima facie case, a plaintiff need only make a very minimal showing." *Jackson v. Fla. Pars. Juvenile Justice Comm'n*, No. CV 16-14864, 2018 WL 3869495, at *6 (E.D. La. Aug. 15, 2018). Nevertheless, courts have still granted summary judgment on the question of constructive discharge despite recognizing this minimal burden. *See, e.g., id.*; *Morrow v. Kroger Ltd. P'ship I*, No. 13-276, 2015 WL 1383960, at *5 (N.D. Miss. Mar. 25, 2015).

### 2. Adverse Employment Action

#### a. Parties' Arguments

##### i. Defendant's Original Memorandum (Doc. 9-1)

Defendant asserts that Plaintiff was not constructively discharged. (Doc. 9-1 at 9.) She was not demoted, received no reduction in pay, did not experience a decrease in job responsibilities, was not assigned menial or degrading work, was not reassigned to a younger supervisor, and was

not offered early retirement. (*Id.*) Plaintiff can only claim that she experienced badgering, harassment, and humiliation, but none of Ms. Anderson's conduct rises to this level. (*Id.* at 9–10.)

First, with respect to evaluations, Plaintiff was consistently rated "Effective" to "Highly Effective" and received an overall rating of "Effective." (*Id.* at 10.) In any event, negative work reviews and even disciplinary actions are insufficient to support a constructive termination claim. (*Id.*) Further, she was evaluated in accordance with school policy, and she was never disciplined, threatened, denied a pay increase, or slighted with respect to pay. (*Id.* at 10–11.)

Second, Plaintiff brought inappropriate sexual education material to school that was discovered by a student and posted on social media. (*Id.* at 11.) But Plaintiff was not disciplined about this incident and suffered no adverse consequence. (*Id.* at 12.)

Third, Plaintiff complains that, on two occasions, she was assigned male students. (*Id.*) However, (1) she was never disciplined or punished in connection with this, and (2) in one instance, the male students were reassigned to another class. (*Id.* at 12–13.)

And fourth, Plaintiff received emails that her lesson plans were in the incorrect format. (*Id.* at 13.) But, she "was not suspended, threatened with termination, or otherwise disciplined in any way for incorrect lesson plans" (*Id.*)

### ii.   Plaintiff's Opposition (Doc. 11)

In response, Plaintiff argues that Defendant "admits that after the first year of Anderson's leadership, nine of its extant teachers left the school, and after the second year, another fourteen left." (Doc. 11 at 20.) Further, "[a]fter the first two years of Anderson's leadership, 23 of the 42 teachers that started out in the fall of 2017 at PBS when Anderson became division head were gone from PBS—more than half." (*Id.*) Plaintiff states that she tried to work through the harassment, discussed the matter with Human Resources and the Superintendent, and asked to be transferred

20

to another supervisor, but she was ultimately forced to resign. (*Id.* at 20–21.)

Plaintiff next urges that Defendant misrepresents the law.  Plaintiff need not prove that the employer's conduct was designed to encourage her resignation. (*Id.* at 21.)  That is, Plaintiff need not have the specific intent to force the employee to resign, though the Plaintiff did so with Anderson's letter recommending that Plaintiff's contract be terminated or not renewed.

According to Plaintiff, Defendant "states that [she] cannot establish 'adverse employment action[s],' but it devotes three and a half pages of its memorandum (pp. 10-13) to attempting unconvincingly to explain why what appears to be a clear pattern of harassment really is not one." (Doc. 11 at 22.)  Plaintiff continues: "Circumstantial evidence that facially neutral incidents were part of a pattern of discrimination on the basis of membership in a protected class may consist of evidence that 'the same individual' engaged in 'multiple acts of harassment, some overtly sexual [or otherwise discriminatory] and some not.' "(*Id.*)

### iii.   Defendant's Reply (Doc. 14)

In reply, Defendant emphasizes the Fifth Circuit cases which have found constructive discharge versus those that have not.  Such a claim has been found "where the employee was placed on a different shift accompanied by a loss in compensation and benefits and where the employee was demoted and had fewer job responsibilities." (Doc. 14 at 9 (citations omitted).) Conversely, the Fifth Circuit has found no constructive discharge "where the employee was embarrassed after being singled out and admonished at an awards banquet or where the employee suffered a poor performance evaluation and loss of responsibilities similar to a demotion." (*Id.* (citations omitted).)  Defendant particularly relies on *Woods v. Sheldon Independent School District*, 232 F. App'x 388 (5th Cir. 2007), where the Fifth Circuit allegedly upheld the lower court's finding of no constructive discharge.

21

Defendant urges that Plaintiff relies only on subjective belief. (Doc. 14 at 10.)  She points to no evidence that she was disciplined, and she was evaluated only four times, in accordance with school policy. (*Id.*) She suffered no discipline or any other adverse consequences from the four issues highlighted above. (*Id.*)

Russell maintains that other teachers left the school and that this proves intolerable conditions, but Plaintiff "does not present any evidence at all as to why these teachers are no longer employed at PBS, only that they are no longer employed at PBS." (Doc. 14 at 10.)  Indeed, one witness testified that two teachers were terminated for budget cuts. (*Id.*)

Lastly, concerning the April 9, 2019 letter from Anderson to McCaughey, Anderson testified that she wrote this letter after being notified of Plaintiff's resignation. (*Id.* at 11.)  Further, Plaintiff stated that, even after the letter, Plaintiff was "offered to hold her summer camps at PBS and was offered a position to remain as assistant volleyball coach." (*Id.*)

iv.   Plaintiff's Surreply (Doc. 17)

Plaintiff begins by disputing the number of evaluations.  Plaintiff says she was evaluated six total times in the 2017-18 school year—four times throughout the year; once on April 20, 2018 (which Defendant counts as an "End-of-the-Year Evaluation"); and once with the anonymous student evaluations. (Doc. 17 at 2.) "The point of the number of evaluations is to demonstrate that PBS scrutinized and evaluated Ms. Russell's performance more often than it did that of Williams and Watts, the younger, black, male comparators." (*Id.* at 2.)

As to the day the letter was sent, (1) Anderson says only that she did not know whether she mailed the letter before or after, and (2) in any event, "[i]t is clear from a reading of Anderson's letter that she had been gathering information and formulating reasons to support her proposed course of action to get rid of Ms. Russell for more than just a few minutes" (*Id.* at 3.)  "The

sentiment is there, and it is clear to any readers of the letter and was clear to Ms. Russell even before Anderson wrote her letter that she was unwelcome and not wanted at PBS. This case presents a classic, textbook case of constructive discharge." (*Id.*)

As to anonymous teaching evaluations, McCaughey testified that there is nothing in the handbook providing for such evaluations. (Doc. 17 at 4.)  Further, Plaintiff testified that she never saw Mr. Williams' evaluations, which supports the conclusion that he did not do one. (*Id.*)

Additionally, *Woods* is distinguishable.  In that case, the Fifth Circuit expressly stated that the plaintiff had 23 years of experience in public schools and would thus know he could not be unilaterally terminated.  Conversely, here, Plaintiff worked in a private school without that level of job security; indeed, the principal wrote a letter to Human Resources and the superintendent advising that Plaintiff's job not be renewed. (*Id.*)  Plaintiff instead relies on two Second Circuit cases, *Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003), and *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996). (*Id.* at 5.)

Plaintiff concludes:

> Numerous genuine disputes of material fact exist which require that this case go to the jury, not the least of which are PBS' motivations for its actions and whether a reasonable person would have felt compelled to resign under the circumstances presented– facts which are inappropriate for resolution on summary judgment.

(Doc. 17 at 5.)

### b.   Applicable Law

"To establish a discrimination claim under Title VII or [the ADEA], a plaintiff must prove that he or she was subject to an 'adverse employment action'—a judicially-coined term referring to an employment decision that affects the terms and conditions of employment." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (citations omitted).  The Fifth Circuit has "held

23

that adverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." *Id.* (citations omitted).   "[A]n employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action." *Id.* (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004)).

A resignation is actionable under Title VII or the ADEA as an adverse employment action if the resignation qualifies as a constructive discharge. *See Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) (Title VII); *Woods v. Sheldon Indep. Sch. Dist.*, 232 F. App'x 385, 388 (5th Cir. 2007) (ADEA). "In determining whether an employer's actions constitute a constructive discharge we ask whether working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign. " *Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338 (5th Cir. 2014) (cleaned up) (quoting *Aryain v. Wal-Mart Stores Tex. LP,* 534 F.3d 473, 480 (5th Cir. 2008)).   "In the constructive discharge inquiry, the court examines the working environment as a whole, and, to find for the plaintiff, must conclude that the resignation was reasonable under all the circumstances." *Robinson v. Waste Mgmt. of Tex.*, 122 F. App'x 756, 758 (5th Cir. 2004). "This holistic review of the workplace takes into account only the specific conditions imposed by the employer; the subjective state of mind of the employee is irrelevant." *Id.*  The Fifth Circuit has "previously identified several factors relevant to constructive discharge, including:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.

*Perret*, 770 F.3d at 339 (quoting *Aryain*, 534 F.3d at 481); *see also Brown*, 237 F.3d at 566 (citing as additional factor "reassignment to work under a younger supervisor").  "Discrimination alone,

without aggravating factors, is insufficient for a claim of constructive discharge, as is a discriminatory failure to promote." *Brown*, 237 F.3d at 566.

A constructive discharge plaintiff need not show that an employer specifically intended to force resignation, *see Green v. Brennan*, 136 S. Ct. 1769, 1779 (2016), but "a constructive discharge claim requires 'a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment,' " *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998). "To establish a claim of hostile work environment under Title VII, a plaintiff must prove he"

> (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race [or sex]; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey v. Henderson*. 286 F.3d 264, 268 (5th Cir. 2002)). "Harassment affects a 'term, condition, or privilege of employment' if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Id*. (quoting *Ramsey*, 286 F.3d at 268). "Workplace conduct 'is not measured in isolation,' " and, in order to deem a work environment sufficiently hostile, "all of the circumstances must be taken into consideration[,]" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. (quoting *Ramsey*, 286 F.3d at 268). "[H]ostile work environment cases have traditionally set a high bar for the amount and type of proof necessary to proceed on the claim." *Dortch v. Mem'l Herman Healthcare Sys.-Sw.*, 525 F. Supp. 2d 849, 874 (S.D. Tex. 2007) (quoting *Ballard v. Healthsouth Corp.* 147 F. Supp. 2d 529, 537 n.5 (N.D. Tex.

2001)).  Thus, for constructive discharge claims, "[t]he environment must be 'something more' than that present in a harassment or hostile work environment claim; a plaintiff must show a 'worse case' harassment scenario, harassment ratcheted up to the breaking point." *Easterling v. Sch. Bd. of Concordia Par.*, 196 F. App'x 251, 253 (5th Cir. 2006) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147–48 (2004)).

*c.* <u>Analysis</u>

Preliminarily, Plaintiff admitted that, at the time she tendered her resignation on April 9, 2019, she had not been demoted, had not received any type of salary reduction, had not had her job responsibilities reduced, had not been assigned menial or degrading work, and had not been assigned to work under a younger supervisor. (*Russell Dep.* 78–79, Doc. 9-5 at 9–10.)  Thus, to prevail, Plaintiff must demonstrate the final factor for a constructive discharge claim—that she suffered "badgering, harassment, or humiliation" by PBS such that the "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *See Perret*, 770 F.3d at 338.

Having carefully considered the matter, the Court finds that no reasonable juror could conclude that the six matters about which Plaintiff complain—individually or in combination—satisfy the high burden of a constructive discharge claim.  The Court will examine each of these issues in turn.

As to the evaluations, Plaintiff complains that her reviews from Anderson were lower than her other reviews. (*Russell Dep.* 86, Doc. 9-5 at 12.)  But, as detailed above, a reasonable juror could not find that any of her reviews (including the ones from Anderson) were negative. (*See Evaluations*, Doc. 11-7, 11-8, 11-9.)

26

Moreover, even if a reasonable juror could conclude that the reviews were negative and that Plaintiff experienced more evaluations than was customary, Plaintiff admitted that, as a result of her evaluations, her pay was never docked, she was never refused a raise, and she never received a pay cut that she was aware of. (*Russell Dep.* 187, Doc. 9-5 at 24.)  Though Plaintiff testified that, based on Anderson's April 9 letter, she was threatened with not being hired, (*id.*), this contradicts her own testimony that she knew at the time of her resignation that she would be offered a new contract for the following year, (*Russell Dep.* 76, Doc. 14-1 at 4.)   Under these circumstances, Russell's evaluations cannot qualify as badgering, harassment, or humiliation sufficient for a constructive discharge. *See Junior v. Texaco, Inc.*, 688 F.2d 377, 379–80 (5th Cir. 1982) (finding no constructive discharge when plaintiff received negative work review in part because the review should not have been "taken as a harbinger of his dismissal" and because "[n]o one suggested to [the employee] that he would be fired"), *abrogated on other grounds by Carroll v. Gen. Accident Ins. Co. of Am.*, 891 F.2d 1174 (5th Cir. 1990); *Boze v. Branstetter*, 912 F.2d 801, 805 (5th Cir. 1990) (finding no constructive discharge of corporate counsel who resigned after critical performance evaluation and alleged loss of responsibilities because a reasonable employee would have either pursued the internal grievance process or filed EEOC complaint while remaining employed); *Woods*, 232 F. App'x at 388–89 (finding no constructive discharge despite claims of "increased scrutiny" of teacher's "teaching and methods" and despite principal mistakenly presenting teacher with option of resignation or retirement and termination because principal was merely carrying out her job responsibilities dutifully and because teacher had alternative to resignation, such as seeking clarification of his employment status).[4]

---

[4] Plaintiff's attempt to distinguish *Woods* also fails.  Plaintiff bases this attempt on the "note" from the Fifth Circuit that the plaintiff "had to know" as a long-time public-school teacher that he could not be unilaterally fired and that Plaintiff in the instant case was a private school teacher with no such protection.  But this statement, made in dicta, is not controlling, as "the subjective state of mind of the employee is irrelevant." *Robinson*, 122 F. App'x at 758; again,

Lastly, even assuming there is a question of fact as to whether Williams received anonymous student evaluations (*compare Russell Dep.* 14, Doc. 9-5 at 5 (stating that Williams was not confronted with student evaluations because she asked him as department chair to produce them and he did not), *with McCaughey Decl.* ¶ 13, Doc. 9-4 (stating that Williams did receive student evaluations); *Williams Aff.* ¶ 9, Doc. 9-11 (stating that he received student evaluations for the 2018-2019 school year, that Plaintiff asked him for his evaluation, and that he did not provide it); *Babin Aff.* ¶¶ 3–5, Doc. 9-12 (stating that she is an art teacher at PBS and that she received student evaluations that contained negative comments); *Polk Aff.* ¶¶ 3, 10, Doc. 9-13 at 1–2 (stating that she is a high school biology teacher and that she received anonymous student evaluations as part of her End-of-the-Year Review)), it is not material because all reasonable jurors would still find that Plaintiff did not endure harassment sufficient merely because she received anonymous student evaluations.

The same result is warranted with respect to Plaintiff being assigned male students. As to the 17 senior male football players, though Plaintiff says she had to "complain repeatedly," she acknowledges that the situation was corrected. (*Russell Decl.*, Doc. 11-2 at 3.) Even putting this aside, the Court finds that Plaintiff was unable to articulate any adverse actions that arose from this situation. Claims that she was "set up" are speculative and subjective. More importantly, Plaintiff admitted that she was never punished or disciplined for not handling the situation

---

the key question is "whether *working conditions* [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Perret*, 770 F.3d at 338 (emphasis added) (cleaned up, citations omitted). Indeed, *Woods* had even more severe harassment than the instant case, as, again, in that case, there was evidence that the principal put the teacher in a position of seeking clarification on his employment status because of a mistaken remark that he had to either resign, retire, or be terminated, which is not present here. To the contrary, again, Plaintiff testified that she knew, at the time she resigned, a new contract was imminent in being offered to her for the following year and that, had she not resigned, she would have been offered a new contract for the following year. (*Russell Dep.* 76, Doc. 14-1 at 4.)

correctly.  (*Russell Dep.* 122, Doc. 9-5 at 13.)  Ultimately, even considering the minimal burden

for a *prima facie* case, no reasonable juror could conclude that merely being assigned male students

constituted  "badgering, harassment, or humiliation" to such a degree as to satisfy the high bar of

a constructive discharge claim.

The Court reaches the same conclusion about Plaintiff's alleged bullying of the student.

Plaintiff declares that Anderson summoned Plaintiff to her office and accused her of bullying a

student and that the student spoke well of Plaintiff and wrote a letter on her behalf.  (*Russell Decl.*,

Doc. 11-2 at 3.)  But statements about what the student said (in Anderson's office or in a letter)

are hearsay.  Without any further details about this incident, the Court cannot conclude that this

rises to the level of badgering, harassment, or humiliation. *See Chapa v. Wells Fargo, N.A.*, No.11-

834, 2014 WL 670816, at *17 (W.D. Tex. Feb. 20, 2014) (granting motion for summary judgment

on constructive discharge issue despite plaintiff's claim that she was badgered, harassed and

humiliated by (1) her supervisor's internal reference form indicating he would not re-hire her; (2)

"an anonymous call to the Ethics Line alleging that Plaintiff called [her manager] a racial slur";

and (3) "an incident in which a co-worker 'became concerned' with Plaintiff's employment status

in response to a comment made by [her manager]").

The incident with sensitive materials also fails as a matter of law.  (*Russell Decl.*, Doc. 11-

2 at 3–4.)  Plaintiff declares that "Anderson unnecessarily escalated this situation and harassed me

about it," but this statement is vague and conclusory.  Plaintiff's deposition is also wholly

inadequate to support such a claim, as she merely makes vague complaints about Anderson not

coming to her sooner or in person.  (*Russell Dep.* 133–34, Doc. 9-5 at 18–19.)  Russell also admits

that she was not disciplined over this incident.  (*Id.*)  Without more, Plaintiff's claim fails. *See*

*Robinson*, 122 F. App'x at 758 ("[T]he subjective state of mind of the employee is irrelevant.").

The lesson plan emails also fall short.  First, Plaintiff's declaration that she was "harassed" and "disciplined" are vague and conclusory.  Second, Plaintiff fails to provide any foundation in her affidavit for saying that Williams and Watts were not "harassed" for such conduct. (*See Russell Decl.*, Doc. 11-2 at 1.)  Worse still, Plaintiff specifically admits in her deposition that she did not know whether Williams or other faculty members received emails that their lesson plans were incorrect. (*Russell Dep.* 168, Doc. 11-11 at 21.) Other evidence confirms that Plaintiff was not alone in receiving emails about her lesson plan formatting, [5] though the Court need not and does not consider it.  And third, Plaintiff could not articulate how she was disciplined in her deposition beyond a vague reference to "discipline against [her] character." (*Russell Dep.* 168–69, Doc. 11-11 at 21–22.)  To the contrary, she admitted that she was never suspended, received a pay cut, or threatened with termination for the lesson plans. (*Id.*)  Since there was no "harbinger of dismissal," *see Junior*, 688 F.2d at 380, and since Plaintiff could have filed an EEOC claim in lieu of resigning, *see Boze*, 912 F.2d at 805, this claim fails.

The incident involving the "shorted paycheck" also fails to meet the burden of a constructive discharge claim.  By Plaintiff's own admission, PBS corrected the problem the day after Plaintiff brought it to their attention and reimbursed her the full amount of disputed money. (*Russell Dep.* 156–57, Doc. 9-5 at 21–22.)  Thus, all reasonable jurors conclude that this minor, short-term incident did not satisfy Russell's burden.

---

[5] Polk testified by affidavit that she was "responsible for making sure the teachers have submitted their lesson plans and that their lesson plans are in the correct format." (*Polks Aff.* ¶ 5, Doc. 9-13.)  She said, "If lesson plans are in the incorrect format, I will email the teacher to correct them.  I have emailed many teachers, including [Plaintiff] and Jermaine Williams, regarding incorrect lesson plans." (*Id.* ¶ 6.)  Similarly, Williams himself testified that he did receive e-mails from Polk regarding his lesson plans being in the incorrect format and that he met with her regarding the format of his lesson plans. (*Williams Aff.* ¶¶ 11–12, Doc. 9-11.)  Defendant also submitted the affidavit of Emily Babin, a high school art teacher at PBS for sixteen years. (*Babin Aff.* ¶ 3, Doc. 9-12.)  Babin said that Anderson was her supervisor between 2017-2018, and that, Babin received emails that her lesson plans were in the incorrect format. (*Id.* ¶¶ 4, 7.)  Personal knowledge can certainly be inferred from all of these statements.

Lastly, Plaintiff's other evidence of badgering, harassment, and humiliation fail.  Plaintiff's complaints that she was treated differently than Williams and Watts (*Russell Decl.*, Doc. 11-2 at 1) contain numerous evidentiary issues, such as a lack of foundation for some (*e.g.*, that Williams and Watts were not required to sign in or out when away from campus and were not "harassed" about lesson plans and class rolls) and the use of vague and conclusory terms (such as "confronted" and "harassed).  Even assuming all of these matters were true, "[d]iscrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge, as is a discriminatory failure to promote." *Brown*, 237 F.3d at 566.  Thus, the key question is whether the "badgering, harassment, or humiliation" passed the high bar of constructive discharge, and it did not.

The other evidence is also insufficient.  Madden's testimony of what she told the Superintendent merely reflected what Plaintiff's subjective views of the situation were and not how a reasonable person would view the situation. *See Robinson*, 122 F. App'x at 758 ("This holistic review of the workplace takes into account only the specific conditions imposed by the employer; the subjective state of mind of the employee is irrelevant.").  Ultimately, Madden's testimony does not provide details as to why Plaintiff's decision to quit was objectively reasonable.  Further, Plaintiff points to the 23 faculty departures between 2017 and 2019, but, again, no details are provided about the circumstances of these departures. (*See McCaughey Dep.* 27–28, Doc. 11-13 at 6–7.)  Concluding that these departures were a result of harassment by Anderson based on protected characteristics is speculative, particularly since two departures were due to budget cuts. (*Id.* at 28, Doc. 11-13 at 7.)

Thus, each of Plaintiff's complaints fail to satisfy the burden of a constructive discharge claim.  Moreover, while the Court agrees with Russell that it must examine "the working environment as a whole" to determine if "the resignation was reasonable under all the

circumstances," *Robinson*, 122 F. App'x at 758, the Court finds that all of the factors, taken together, still fail to rise to the level of a constructive discharge claim.

Caselaw confirms the Court's conclusion.  In addition to the decisions highlighted above, *Lofton v. City of W. Point*, No. 10-282, 2012 WL 1135862 (N.D. Miss. Apr. 4, 2012), serves as a prime example.  There, the district court found no constructive discharge when plaintiff claimed that:

> (i) she was reprimanded one time for not wearying pantyhose, (ii) [the office manager], on a couple of occasions, made comments that were supposedly directed at the way [plaintiff] dressed, (iii) she was once asked to cashier and was told to go home when she informed [the office manager] that she had no cashier drawer, and (iv) [the office manager][ asked her where she was going during her break and how long she would be[,] [and (v) the office manager] allegedly moved [plaintiff[ to a different office on one occasion.

*Id*. at *17.  In rejecting plaintiff's argument, the district court collected cases on this issue and stated:

> To establish constructive discharge, the plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992). Lofton has failed to meet such a burden here. Indeed, the Fifth Circuit has found conduct far more egregious than the conduct complained of in this matter was insufficient to establish constructive discharge. *See, e.g., Stover v. Hattiesburg Public School Dist.*, 549 F.3d 985 (5th Cir. 2008) (employee's assertions that she was not provided the same career development opportunities, her complaints of discrimination were not investigated, her supervisor exhibited anger and violence, and that she was excluded from prestigious retreats were not sufficient to support a claim of constructive discharge); *Harvill v. Westward Communications, L.L.C .*, 433 F.3d 428, 440 (5th Cir. 2005) (employee's assertions that she was treated "rudely and with general hatefulness," that a man she did not know began taking pictures of her, that a meritless racial harassment charge was brought against her, and that a new supervisor was overheard to state that he would receive a bonus if he ran her off were not sufficient to demonstrate harassment so intolerable that a reasonable employee would feel compelled to resign); *Brown v. Bunge Corp.*, 207 F.3d 776, 782–83 (5th Cir. 2000) (affirming summary judgment to employer on constructive discharge where the resigning employee showed he was demoted and had fewer job responsibilities); *McCann v. Litton Sys., Inc.,* 986

F.2d 946, 952 (5th Cir. 1993) (finding no constructive discharge when the plaintiff was given the option—in the midst of a company-wide reduction in force—of either retiring or transferring to a new and "not well defined" position at a 12% pay cut, under the supervision of a man half his age); *Jurgens v. EEOC,* 903 F.2d 386, 393 (5th Cir. 1990) ("However, without continuing harassment or repeated discriminatory impediment to any advance ..., dimmed future job prospects based upon the employer's past discrimination in promotions are not alone enough to support a finding of constructive discharge.") (citation omitted); *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748, 752, 755 (5th Cir.1986) (finding no constructive discharge after the plaintiff was demoted "with much sorrow and humiliation" from his job as high school football coach and transferred to another school), *aff'd in part and remanded in part on other grounds by* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Vaughan v. Pool Offshore Co.,* 683 F.2d 922, 926 (5th Cir. 1982) (African–American employee was not constructively discharged on the basis of pranks, tricks, heavy-handed humor and crude racial language). Accordingly, Lofton has failed to establish she was constructively discharged and, for this reason, Defendant's summary judgment motion as to this claim is granted.

*Id.*

The same reasons apply here. *Loften* and the Fifth Circuit authority *Lofton* highlights all involve situations as bad as or worse than that faced by Plaintiff. Based on these cases, Russell's complaints against PBS simply fail as a matter of law.

Again, "a constructive discharge claim requires 'a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment.' " *Benningfield*, 157 F.3d at 378 (quoting *Landgraf*, 968 F.2d at 430). "[H]ostile work environment cases have traditionally set a high bar for the amount and type of proof necessary to proceed on the claim." *Dortch*, 525 F. Supp. 2d at 874 (quoting *Ballard*, 147 F. Supp. 2d at 537 n.5). And for constructive discharge claims, "[t]he environment must be 'something more' than that present in a harassment or hostile work environment claim; a plaintiff must show a 'worse case' harassment scenario, harassment ratcheted up to the breaking point." *Easterling*, 196 F. App'x at 253 (quoting *Suders*, 542 U.S. at 147–48). The Court has considered all of the above issues, individually and in combination, and finds that no reasonable juror could conclude that Plaintiff endured the

badgering, harassment, and humiliation necessary to sustain a constructive discharge claim. Consequently, Defendant's motion is granted, and Plaintiff's claims of discrimination under Title VII and the ADEA will be dismissed.

### B.  Retaliation and FMLA Claims

Plaintiff fails to make any substantive argument in her opposition or surreply about the retaliation and FMLA claims. (*See* Doc. 11; Doc. 17.)   "The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal." *JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (quoting *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n. 10 (S.D. Tex. 2003)); *see also United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015) ("This failure to develop the relevant argument effectively represents a waiver of the point." (citing *United States v. Dominguez–Chavez*, 300 F. App'x 312, 313 (5th Cir. 2008) ("Dominguez has failed to adequately raise or develop his due process and equal protection arguments in his appellate brief, and, thus, they are waived."); *El–Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones.")); *United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation . . . is a failure to brief and constitutes waiver.").

"By analogy, failure to brief an argument in the district court waives that argument in that court." *JMCB*, 336 F. Supp. 3d at 634 (quoting *Magee*, 261 F. Supp. 2d at 748 n.10); *Kellam v. Servs.*, No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd sub nom. Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014) ("Generally, the failure to respond to

arguments constitutes abandonment or waiver of the issue." (citations omitted)); *Mayo v. Halliburton Co.*, No. 10-1951, 2010 WL 4366908, at *5 (S.D. Tex. Oct. 26, 2010) (granting motion to dismiss breach of contract claim because plaintiff failed to respond to defendants' motion to dismiss on this issue and thus waived the argument).

Consequently, because Plaintiff failed to meaningfully oppose Defendant's motion on these claims, the Court will grant PBS's motion on those issues on the grounds of waiver. *See JMCB*, 336 F. Supp. 3d at 634 (finding that operative complaint could be dismissed because plaintiff failed to respond to the substance of defendant's arguments); *Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 672 (M.D. La. 2019) (deGravelles, J.) (finding that policy exclusion could apply because plaintiff failed to oppose insurer's argument on the issue); *see also Wuestenhoefer*, 105 F. Supp. 3d at 672 (finding that relator waived argument as to how certain write-offs fell within a particular provision of the False Claims Act). Consequently, Plaintiff's claims of retaliation under the ADEA and Title VII and under the FMLA will be dismissed.

## V.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Defendant's Motion for Summary Judgment* (Doc. 9) filed by Parkview Baptist School, Inc. is **GRANTED**, and all claims by Plaintiff Beverly Russell against Defendant are **DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on March 25, 2021.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**